IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. WARNER


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

JAMES D. WARNER, APPELLANT.


Filed August 23, 2016.    No. A-15-858.


Appeal from the District Court for Douglas County: W. MARK ASHFORD, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, April M. Lucas, and John J. Cavanaugh, Jr., for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.


INBODY, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Following a jury trial in the district court for Douglas County, James D. Warner was convicted of first degree sexual assault pursuant to Neb. Rev. Stat. § 28-319(1) (Reissue 2008), a Class II felony, and was sentenced to 14 to 20 years' imprisonment. On appeal, Warner argues that (1) the district court erred in failing to conduct a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), prior to receiving the State's DNA evidence; (2) his counsel was ineffective; and (3) his sentence is excessive. For the following reasons, we affirm.

BACKGROUND

On May 20, 2014, Warner was charged by information with one count of first degree sexual assault. The information alleged that on March 16, 2013, in Douglas County, Nebraska,

Warner subjected K.P. to sexual penetration without her consent or when he knew or should have known that she was mentally or physically incapable of resisting or appraising the nature of his conduct.

Prior to trial, Warner filed a motion in limine in which he argued that the reasoning and methodology used by the State's DNA expert to draw conclusions regarding DNA evidence in the case did not satisfy the requirements of *Daubert/Schafersman*. At a hearing on the motion, Warner's counsel argued that the case involved an "interesting situation" because the State's DNA expert had concluded in a report that there were "at least three parties in one of the [DNA] mixtures or two of the mixtures," and that counsel "could show that [the expert's] reasoning in reaching that conclusion is flawed, because there's actually only two persons in that mixture." The court denied Warner's motion "as far as the *Daubert* issue [was] concerned," reasoning that the reliability of DNA testing methods was well-established and that the "theory and technique" was generally accepted. However, the court noted that the issues Warner raised "very well may be valid issues for the purposes of trial and may be subject to further motions in limine, but right now I don't think that exists yet."

The jury trial took place from May 4 to 7, 2015. On the morning of trial, Warner renewed his motion in limine based on *Daubert/Schafersman*, and the district court denied it. During the testimony of the State's DNA expert, Warner's counsel did not make any objections based on *Daubert/Schafersman*. However, Warner again renewed his *Daubert/Schafersman* motion at the close of the evidence, and the court again denied the motion.

Because on appeal Warner does not challenge the sufficiency of the evidence, we only briefly summarize the evidence presented at trial. We discuss additional facts as necessary in our analysis section below. Generally, the evidence showed that Warner and K.P. were first cousins who had known each other as young children but had not seen each other for nearly 10 years. At some point during March 2013, K.P., who was 21 years old at the time, learned that Warner was coming to Omaha, Nebraska, for a visit. On the evening of Friday, March 15, during Warner's visit to Omaha, K.P. went to a bar with Warner, K.P.'s female cousin, her female cousin's boyfriend, Warner's sister, and Warner's sister's boyfriend. At the bar, the group consumed alcohol and became intoxicated.

At approximately 2 a.m. on Saturday, March 16, 2013, the group left the bar, and Warner and K.P. both went to her female cousin's house. K.P. recalled that after she arrived at the house, she began throwing up. At some point, she laid down on a couch just outside of her cousin's upstairs bedroom, and her cousin covered her with a blanket. K.P. remembered feeling "really drunk" and having the sensation of falling. She then "passed out."

The next thing K.P. remembered was feeling like she was having a hard time breathing. She started "fighting [her]self awake," and when she came to, she discovered that Warner was on top of her. She felt Warner place his penis in her vagina and begin moving it in and out. He then pulled his penis out of her vagina and ejaculated on her stomach and thigh. K.P. was "still really messed up" and felt like she was "still spinning." K.P. pushed Warner off of her and ran downstairs to the bathroom. She did not have on any clothing, and she ran back upstairs and retrieved her clothing. She then slept on the floor of the downstairs living room, next to her cousin's children.

Later in the day on Saturday, March 16, 2013, K.P. told her sister about the sexual assault. On the following Monday, March 18, K.P. told her aunt about it. On Monday evening, K.P. went to the emergency room at a hospital in Omaha. Because of the amount of time that had passed since the assault, and because K.P. had showered, a rape kit was not performed. However, law enforcement was contacted, and a police officer retrieved the clothing K.P. had worn on the night of the assault. Buccal swabs were also obtained from Warner and K.P. for purposes of DNA comparison.

The State's DNA expert was Heidi Young, a forensic scientist at the Nebraska State Patrol Crime Laboratory (NSP Crime Lab). We will discuss the specific details of Young's testimony in the portion of our analysis addressing the *Daubert*/*Schafersman* issue. Generally, Young testified that Warner could not be excluded as a contributor to semen found on K.P.'s underwear and shorts.

The jury found Warner guilty of first degree sexual assault. A sentencing hearing took place on August 17, 2015. At the beginning of the hearing, Warner's counsel objected to portions of the presentence investigation report (PSR) referencing allegations of prior sexual assaults committed by Warner on family members. The court stated that it could not "take them out" but that it would give the information "whatever weight it presents accordingly."

At the sentencing hearing, the court heard statements from Warner and his sister. Warner expressed remorse for his actions and indicated that, while alcohol was not an excuse, he believed he was an alcoholic and had been attending AA meetings.

The court stated that it had reviewed the PSR and considered the victim impact statement included in it. The court indicated that Warner's conduct was "horrific" and that it was no defense that he had been drinking. The court sentenced Warner to 10 to 14 years' imprisonment with 106 days' credit for time served.

Warner timely appealed to this court.

## ASSIGNMENTS OF ERROR

Warner assigns, restated and renumbered, that (1) the district court erred by not conducting a *Daubert*/*Schafersman* hearing on the State's DNA evidence, (2) his trial counsel provided ineffective assistance, and (3) his sentence is excessive.

## STANDARD OF REVIEW

The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

A claim that defense counsel provided ineffective assistance presents a mixed question of law and fact. *State v. Sidzyik*, 281 Neb. 305, 795 N.W.2d 281 (2011). In order to establish a right to relief based on a claim of ineffective assistance of counsel, the defendant has the burden, in accordance with *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense in his or her case. *State v. Sidzyik, supra*. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be

resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

ANALYSIS

*DNA Evidence*.

Warner argues that the district court failed to carry out its gatekeeping function pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), when it admitted the State's DNA evidence. Warner asserts that the DNA evidence in this case "had particular complications given that there was a mixture of DNA and the State's witness had shown that one sample had contained 3 individuals, measured against [Warner and K.P.], and other [sic] sample showed only 2 individuals." Brief for appellant at 22. According to Warner, pursuant to *Daubert*/*Schafersman*, the court should have evaluated "the specific methodology used in this case [and] the proper application of the analysis." *Id*.

The State responds that Warner failed to preserve his challenge to the State's DNA evidence. The State also argues that expert testimony is admissible under *Daubert*/*Schafersman* if the validity of the expert's reasoning or methodology has been established, as the validity of DNA testing has been established. The State contends that any question as to the manner in which the methodology was applied goes to the weight of the evidence.

Perhaps anticipating the State's waiver argument, Warner also argues that his trial counsel was ineffective for failing to properly preserve for appeal any error in the admission of the State's DNA evidence.

Ordinarily, a challenge to the admissibility of evidence under *Daubert*/*Schafersman* should take the form of a concise pretrial motion that identifies what is believed to be lacking with respect to the validity and reliability of the evidence. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013). And to preserve a challenge on appeal to the admissibility of evidence on the basis of *Daubert*/*Schafersman*, a litigant must object on that basis and the objection should alert the trial judge and opposing counsel as to the reasons for the objections to the evidence. *Id*.

Here, Warner filed a pretrial motion based on *Daubert*/*Schafersman*, and he renewed his motion at the beginning and end of trial. However, he did not object to Young's expert testimony during trial. Whether we conclude that this was sufficient to preserve the *Daubert*/*Schafersman* issue for appeal, or whether we conclude that it was insufficient and instead address Warner's ineffective-assistance-of-counsel argument, the result of our analysis would be the same. As we now explain, the court did not abuse its discretion in admitting the State's DNA evidence.

Under the *Daubert*/*Schafersman* jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *State v. Edwards*, 278 Neb. 55, 767 N.W.2d 784 (2009). This gatekeeping function entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id*. Once the validity of the expert's reasoning or methodology has been satisfactorily established, any remaining questions regarding

the manner in which that methodology was applied in a particular case will generally go to the weight of such evidence. *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003).

In evaluating the admissibility of expert scientific testimony, a trial judge considers a number of factors. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). These factors include whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in a particular technique, there exists a high known or potential rate of error; whether standards exist for controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id*. These factors are not exclusive or binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. *Id*.

However, a pretrial hearing under *Daubert*/*Schafersman* is not always mandated, and the extensiveness of any such hearing is left to the discretion of the trial court. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010). Courts need not reinvent the wheel each time that specialized evidence is adduced. *Id.* Instead, once a Nebraska trial court has actually examined and assessed the reliability of a particular scientific wheel under *Daubert*, and its determination has been affirmed on appeal, then other courts may simply take judicial notice and ride behind. *Id*.

Here, Young testified that the NSP Crime Lab is accredited by the American Society of Crime Laboratory Directors (ASCLD), which requires the lab to follow established standards and procedures. The full lab goes through the accreditation process every 5 years, and the DNA portion of the lab has an external audit every 2 years and an internal audit every year. She believed that the full lab was first accredited by ASCLD in 2004, although she was not employed there at the time, and most recently re-accredited in 2014. Young also testified that the NSP Crime Lab is a "CODIS lab," which means that it is authorized to use the FBI's CODIS database of DNA from persons convicted of crimes. In order to use the CODIS database, the lab has to comply with the FBI's DNA testing requirements. Young testified that the type of DNA testing utilized at the NSP Crime Lab complies with FBI and ASCLD requirements and is generally accepted in the relevant scientific community. Young is required to pass a proficiency examination twice per year.

Young explained the methodology she used to examine the DNA samples she obtained from semen located on K.P.'s shorts and underwear. She testified that "polymerase chain reaction," or "PCR," consists of "making millions and millions of copies of the DNA so it can be run through a genetic analyzer." "[S]hort tandem repeat," or "STR," is a "small sequence of DNA that's repeated." Once a DNA sample is copied using PCR, the genetic analysis consists of comparing "how many repeats of those STRs" are found at certain locations on the strands of DNA being tested. According to Young, the NSP Crime Lab compares DNA profiles at 15 designated "loci" or locations, in compliance with FBI and ASCLD standards.

Young testified that when working with a semen sample, she performs a "differential extraction," which attempts to separate any female DNA from any sperm DNA. The female DNA is called the "epithelial fraction," while the sperm DNA is called the "sperm fraction." For the semen samples obtained from K.P.'s shorts and underwear, Young was able to extract a sperm fraction and an epithelial fraction; however, she explained that some female DNA may remain in the sperm fraction during testing.

Young was able to determine that the epithelial fractions of the shorts and the underwear samples each contained a mixture of DNA from two people, with a female being the major contributor. The sperm fractions of the shorts and the underwear samples each contained a mixture of DNA from at least three people, but no major contributor could be determined. The number of contributors to each sample was determined by analyzing the number of alleles at each locus that was tested. Because each person has two alleles at each locus, if there were four alleles at a certain locus in the sample, there were at least two contributors to the sample; if there were six alleles, there were at least three contributors.

Young compared the epithelial and sperm fractions of the samples to Warner's known DNA profile and reached the following conclusions: Warner was excluded as a contributor to the epithelial fractions of the shorts and underwear samples, but Warner could not be excluded as a contributor to the sperm fractions of the shorts and underwear samples. The probability that an unrelated person was a contributor to the sperm fraction of the underwear sample was 1 in 30,170 in the United States Caucasian population. The probability that an unrelated person was a contributor to the sperm fraction of the shorts sample was 1 in 2.578 million in the United States Caucasian population.

Young explained that the statistics were calculated using the frequencies of alleles in the general population. According to Young, when you have a mixed DNA sample with two or more contributors, it lowers the statistic that can be reported. This is because in a mixed sample, there can be up to six alleles at each locus tested on the DNA profile, which increases the likelihood that a random person's DNA would match.

We conclude that the district court did not abuse its discretion in receiving Young's expert testimony. Young testified that the DNA testing methods used in the NSP Crime Lab are generally accepted in the relevant scientific community, and the Nebraska Supreme Court has "repeatedly found that the PCR-STR analysis itself produces sufficiently reliable information to be admitted at trial." *State v. Bauldwin*, 283 Neb. 678, 704, 811 N.W.2d 267, 289 (2012). Moreover, Young's lab is accredited by ASCLD and complies with the FBI's testing requirements, and Young is required to pass a proficiency examination twice a year. Overall, Young's testimony was substantially similar to testimony in other cases that has been deemed sufficient to satisfy the *Daubert*/*Schafersman* framework. See *State v. Bauldwin, supra*; *State v. Tolliver*, 268 Neb. 920, 689 N.W.2d 567 (2004).

We are not persuaded by Warner's contention that this case is unique because some of the DNA samples showed at least three contributors while some showed two contributors. Other cases in which the PCR-STR analysis has been accepted as reliable also involved identifying contributors to mixed samples of DNA. See, e.g., *State v. Bauldwin, supra*. In *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011), the court specifically determined that the effect of a mixed DNA sample on the probability that an unrelated person contributed to the sample went to the weight of the evidence, not its admissibility. Here, Young explained in detail how she determined the minimum number of contributors to each sample and how the number of contributors affected the probabilities she reported in her conclusions. It was for the jury to determine how the mixed samples affected what weight to give the DNA evidence; they did not affect the admissibility of the DNA evidence. See *State v. Ellis, supra*.

*Ineffective Assistance of Counsel.*

Warner also argues that his trial counsel provided ineffective assistance in three ways: (1) counsel failed to introduce into evidence a video that could have been used to impeach K.P.'s testimony; (2) counsel failed to object to inadmissible hearsay evidence from K.P.'s sister regarding the sexual assault; and (3) counsel failed to "refute uncorroborated hearsay" contained in the PSR. Brief for appellant at 18.

In order to prevail on a claim of ineffective assistance of counsel at trial, the defendant has the burden, in accordance with *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *State v. Dunster*, 278 Neb. 268, 769 N.W.2d 401 (2009). The defendant also must show that counsel's deficient performance prejudiced the defense in his or her case. *Id*. This requires the defendant to demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. The two prongs, deficient performance and prejudice, may be addressed in either order. *Id*.

In most instances, claims of ineffective assistance of trial counsel cannot be reached on direct appeal, because the record does not contain facts necessary to decide either prong of the analysis under *Strickland v. Washington, supra. State v. Young*, 279 Neb. 602, 780 N.W.2d 28 (2010). Generally, we can reach ineffective assistance of counsel claims on direct appeal only in those instances where it is clear from the record that such claims were without merit or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy can overcome the effect of the error. *Id*. An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

We first address Warner's claim that his counsel was ineffective for failing to introduce into evidence a video that could have been used to impeach K.P.'s credibility. The video, which is not contained in our record, apparently was taken one or two days following the assault and shows K.P. having fun and being happy.

Based on the evidence presented at trial, Warner cannot establish prejudice based on his counsel's failure to introduce the video into evidence. At trial, K.P. testified that on the evening of Sunday, March 17, 2013, which was less than 2 days after the sexual assault, she went to her female cousin's birthday party and had "a pretty good time," and a picture showing K.P. smiling with her cousin and sister at the party was received into evidence. On cross-examination, K.P. also testified that on the afternoon of Monday, March 18, she posted on her Facebook page a message stating, "I have to admit I have an awesome personality I blew that interview out of the water." The message was followed by a smiley face emoticon and the following hashtag: "#livinglife2thefullest." She explained that she had a job interview on that Monday and was excited about it because she had been out of work for 1½ months.

In light of this evidence of K.P.'s activities in the 2 to 3 days following the sexual assault, a video showing K.P. having fun and being happy during this same time period would have been

cumulative. Therefore, to the extent that K.P.'s behavior in the 2 to 3 days following the sexual assault had any tendency to impeach her credibility, the video could not have altered the outcome of the trial. See *State v. Britt*, 293 Neb. 381, ___ N.W.2d ___ (2016) (improper admission or exclusion of cumulative evidence may be harmless).

Warner next claims that his counsel was ineffective for failing to object to inadmissible hearsay from K.P.'s sister regarding the sexual assault. According to Warner, K.P.'s sister testified as to what K.P. told her about the incident, and his counsel should have prevented this "harmful testimony from being presented to the jury." Brief for appellant at 18.

K.P.'s sister testified that on Saturday, March 17, 2013, she was in the car with K.P. when K.P. became upset. K.P. then told her sister that the prior night she had woken up to Warner "touching" her. K.P. was very upset and crying and said she remembered going to the bar and taking shots and leaving the bar. K.P.'s sister testified that for the next 15 or 20 minutes, K.P. "was mostly just . . . feeding the night to [her]."

Warner cannot establish prejudice based on his counsel's failure to object to the hearsay portions of K.P.'s sister's testimony. The sister provided very little detail about what K.P. told her, other than that K.P. said she woke up to Warner "touching" her. The admission of hearsay that is merely cumulative and could not have prejudiced the defendant by materially influencing the jury is harmless error. *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995). We conclude that the hearsay portions of the sister's testimony were cumulative and could not have prejudiced Warner by materially influencing the jury.

Finally, Warner claims that his counsel was ineffective for failing to "refute uncorroborated hearsay" contained in the PSR. He maintains that the PSR contained hearsay regarding "alleged past sexual assault incidents . . . that were never charged nor investigated by police" and that he was prejudiced because the statements "implied previous acts of sexual violence towards similarly situated family members." Brief for appellant at 19.

The PSR contains a police report from 2004 detailing an investigation into allegations that Warner sexually assaulted his sister and K.P.'s sister on several occasions. The victim impact statement also referenced the allegations of past sexual assaults. There is no indication that Warner was charged at the time with any offense. At the beginning of the sentencing hearing in the present case, Warner's counsel objected to the allegations of prior sexual assaults contained in the PSR. The court stated that it could not "take them out" but indicated that it would give the information "whatever weight it presents accordingly."

The Nebraska Supreme Court has held that reliance upon hearsay information in a PSR is not inappropriate, because the sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed. *State v. Hunnel*, 290 Neb. 1039, 863 N.W.2d 442 (2015). Nevertheless, in this case, there is no indication that the court found the allegations of prior sexual assaults to be relevant to its sentencing decision. The court stated it would give the allegations "whatever weight" they warranted, and the court did not specifically reference the allegations of prior sexual assaults when sentencing Warner. Moreover, whether or not the court relied on the allegations of prior sexual assaults, it appears that trial counsel rendered competent performance by objecting to the

allegations. Because Warner cannot establish deficient performance or prejudice, Warner cannot establish that his counsel was ineffective.

*Excessive Sentence.*

Warner also argues that his sentence is excessive. He contends that his "mentality . . . demands a significantly shorter sentence," because he has admitted to being an alcoholic, he was "intoxicated to the point of black-out" during the incident, and he began treatment for his alcoholism prior to sentencing. Brief for appellant at 24. He further argues that the court failed to consider his "lack of criminal record," which consists of two convictions of driving under the influence (DUI). *Id.* In addition, he contends that the court failed to consider the "motivation and lack of violence to the crime," as nothing indicated any "violence or malicious intent toward [K.P.]." *Id.*

As noted above, an appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015). Factors a judge should consider in imposing a sentence include the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011). "The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life." *Id.* at 196, 802 N.W.2d at 433.

The PSR indicated that Warner was 30 years old at the time of the sentencing hearing. He was not married and had no children. He had graduated from high school and served in the Navy for approximately 7 years. At the time of the offense, he was attending college in Green Bay, Wisconsin, on the G.I. Bill. His prior criminal history included one DUI in November 2011 and a second DUI in June 2012. For the second DUI, Warner served 75 days in jail and had his driver's license revoked for 1 year. On the Level of Service/Case Management Inventory, Warner scored in the high risk range in the domains of "Antisocial Pattern, Procriminal Attitude/Orientation, and Leisure/Recreation," and in the medium risk range in the domains of "Criminal History, Education/Employment, Family/Marital, Companions, and Alcohol/Drug Problems." The PSR contained a victim impact statement from K.P., as well as supportive letters from Warner's friends and family. As stated, Warner expressed remorse for his actions at the sentencing hearing and informed the court that he had begun addressing his alcohol problem.

The court indicated that it had carefully considered the PSR and it acknowledged Warner's expressions of remorse. The court found that Warner's conduct was "horrific" and that being drunk was no defense. The court stated that "[t]his kind of conduct cannot be condoned, and it must be dealt with in an appropriate fashion." The court said it had considered all possible sentences and found that the sentence it imposed was one that "would appropriately deal with what we have before us today."

Warner's offense of first degree sexual assault was a Class II felony, § 28-319(2), punishable by 1 to 50 years' imprisonment. Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2014). His sentence of 10 to 14 years' imprisonment was within statutory limits and, in fact, was toward the

lower end of the applicable sentencing range. See *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990) (minimum portion of indeterminate sentence measures its severity). Having considered the evidence and the relevant factors in this case, we find that the sentence the court imposed is not excessive or an abuse of discretion, and we affirm the sentence.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Douglas County.

AFFIRMED.