IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

MALCHOW V. ARMBRUSTER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RAY D. MALCHOW, APPELLEE,
V.
WENDY J. ARMBRUSTER, ALSO KNOWN AS WENDY FREEBORN, APPELLANT.

Filed March 11, 2014.    No. A-13-235.

Appeal from the District Court for Gage County: PAUL W. KORSLUND, Judge. Affirmed.

Lyle J. Koenig, of Koenig Law Firm, for appellant.

Chris A. Johnson, of Conway, Pauley & Johnson, P.C., for appellee.

IRWIN, MOORE, and BISHOP, Judges.

IRWIN, Judge.

## I. INTRODUCTION

This appeal concerns a dispute over the custody and visitation schedule for Alexxandra Malchow (Alexx), the minor child of Ray D. Malchow and Wendy J. Armbruster (Wendy). In the proceedings below, Ray filed a motion to modify the parties' visitation arrangement and Wendy filed a motion to change custody of Alexx from Ray to Wendy. The district court granted Ray's request to modify the parties' visitation arrangement and denied Wendy's request to change custody. Wendy appeals from this decision. On appeal, Wendy challenges certain evidentiary rulings made by the district court; asserts that the court erred in modifying the visitation schedule and not changing custody from Ray to Wendy; and disputes the court's award of attorney fees to Ray. For the reasons set forth below, we affirm the decision of the district court in its entirety.

## II. BACKGROUND

These proceedings involve Alexx, born in January 2002. Ray is Alexx's biological father, and Wendy is Alexx's biological mother. Ray and Wendy have never been married.

- 1 -

## 1. PROCEDURAL HISTORY

Alexx has lived with Ray since she was approximately 3 months old. Initially, this living arrangement was the result of a voluntary agreement between the parties so that Wendy could attend college and Ray's mother could provide daycare for Alexx. However, in April 2004, the district court entered a formal custody order concerning Alexx. In the order, the court found that both Ray and Wendy were good parents who were capable of providing care to Alexx. The court went on to find that given that Alexx had resided with Ray for the previous 2 years, it would be in her best interests to remain in his custody subject to Wendy's "liberal parenting time." That parenting time was to include every other weekend, specified holidays, and 6 weeks during the summer.

In March 2006, the district court entered an order modifying the April 2004 custody order. This subsequent order is not included in our record, but apparently, the order altered only the parties' visitation schedule by awarding Wendy additional visitation time. Alexx remained in the custody of Ray.

On March 3, 2011, Ray filed a complaint to modify the prior custody and visitation order. In the complaint, Ray alleged that a material change of circumstances had occurred since the entry of the March 2006 order. Specifically, he alleged that during Alexx's visitations with Wendy, Wendy was manipulative and was attempting to undermine Alexx's relationship with Ray and with Alexx's therapist. Ray went on to allege that Wendy's behaviors were causing Alexx to suffer from "adverse health effects." Ray requested that Wendy's visitation time with Alexx be restricted or supervised.

Also on March 3, 2011, Ray filed a motion requesting an ex parte order restricting Wendy's visitation time with Alexx. Attached to the affidavit was a letter from Alexx's therapist, Karen Sharer-Mohatt. Ray's motion is not included in our record, but apparently, the district court granted Ray's request and entered an ex parte order permitting only supervised visitation time between Wendy and Alexx pending a hearing.

On March 24, 2011, Wendy filed an answer and cross-complaint requesting that she be awarded custody of Alexx. Wendy denied Ray's assertions regarding her behavior during visits with Alexx. In addition, she alleged that Ray and his wife were actively interfering with her relationship with Alexx and that it would be in Alexx's best interests to reside with her on a permanent basis. Wendy also filed a motion to vacate the ex parte order and a motion requesting the court to appoint an expert to conduct a custody evaluation.

A hearing was held on March 31, 2011, concerning the previously entered ex parte order and concerning Wendy's motion for a custody evaluation. After the hearing, the district court entered an order reinstating Wendy's parenting time with Alexx. The court did indicate that during both parties' time with Alexx, they were not to "discuss or inquire of the minor child about activities in which she is involved with the other parent, or ask the child to choose between activities with one parent or the other." The court also appointed Alexx her own attorney for the custody proceedings and postponed its decision about the custody evaluation until Alexx's attorney could make an informed recommendation on the matter. At some point in time after the entry of this order, however, the district court apparently denied Wendy's request for a custody evaluation.

Prior to trial, Wendy repeatedly objected to Sharer-Mohatt's testifying. Wendy argued that it was not fair that Alexx's therapist could testify when the court had denied her request for an independent mental health professional to conduct a custody evaluation. In addition, Wendy objected to Sharer-Mohatt's testimony on the basis that she was not qualified to offer expert testimony. The court denied both of Wendy's motions and permitted Sharer-Mohatt to testify concerning her observations and treatment of Alexx and her opinion as to whether Wendy's visitation time with Alexx should be supervised.

In July 2012, trial began on Ray's complaint to modify Wendy's visitation time and on Wendy's complaint to modify custody. The trial continued in October 2012. At the trial, Ray and Wendy each testified about their relationship with Alexx and about their current circumstances. In addition, both Ray and Wendy offered other evidence, including the testimony of Sharer-Mohatt, which concerned their parenting abilities and their relationships with Alexx.

## 2. RAY'S TESTIMONY

At the time of the modification trial, Ray was living in Beatrice, Nebraska. Ray had been married for 7 years, and he and his wife had a daughter together. Ray testified that he currently works full time and that the exact hours he works in any given day or week may vary.

Ray testified that Alexx has been living with him since she was approximately 3 months old. He indicated that in the 2 or 3 years preceding his filing of the complaint to modify Wendy's visitation time, he had become increasingly concerned about Alexx's relationship with Wendy. Specifically, Ray testified that Alexx was often upset about things that Wendy was saying to her and that Alexx felt like Wendy was pressuring Alexx to live with Wendy at her home in Kansas. Ray indicated that Alexx would "have fits where she would cry and just get mad at everybody, lash out at people for no reason." Alexx would also "start itching very profusely in areas where she would get red and raw."

Because of Ray's concerns about Alexx's behavior after her contact with Wendy, Ray contacted a psychologist to provide counseling for Alexx. Alexx started seeing Sharer-Mohatt in November 2009. Since that time, Alexx has seen Sharer-Mohatt approximately once per week.

Ray also began monitoring Alexx's telephone conversations with Wendy. During his monitoring of the telephone calls, he has heard Wendy tell Alexx that Alexx chooses to spend time engaging in extracurricular activities, like participating in horse shows, rather than spending time with Wendy and Wendy's family. He also overheard Wendy tell Alexx, "You don't love me." These exchanges hurt Alexx's feelings, and she would begin to cry while on the telephone. Ray also heard Wendy continually pressure Alexx to come and live with her, even though it was obvious that such conversations were upsetting to Alexx and were making her uncomfortable. At some point after Alexx began counseling, Ray also began recording Alexx's telephone conversations with Wendy so that Sharer-Mohatt could listen to the exchanges and offer advice.

Ray testified that after the district court entered the ex parte order temporarily suspending Wendy's unsupervised visitations with Alexx in March 2011, Alexx's behavior improved. He testified that Alexx "stopped itching" and that she stopped "throw[ing] fits." Ray indicated that he believed Alexx was happy during this time period and that there was "a weight lifted off of her shoulders." However, Ray also testified that not long after Wendy's visits with Alexx resumed, Wendy continued to have inappropriate interactions with Alexx and Alexx continued to

struggle with their relationship. Wendy pressured Alexx to live with her, and Alexx would come home from visits with Wendy crying and angry and would scratch her skin.

Ray testified that Wendy refuses to accept responsibility for any of Alexx's problems or feelings. Wendy blames Ray for everything that is going on with Alexx. Ray testified that he wanted the district court to require Wendy to have only supervised visits with Alexx until such time as Wendy has completed counseling to learn how her behavior is affecting Alexx. Ray agreed that after Wendy has completed counseling, her visitation could return to the visitation schedule established in the March 2006 modification order.

### 3. WENDY'S TESTIMONY

At the time of the modification trial, Wendy was living in Hays, Kansas. Wendy had been married for 8 years, and she and her husband had two young daughters together.

Wendy testified that Alexx is a very good student who enjoys participating in athletics, including softball, dance, and horse shows. Wendy testified that she tries to be supportive of Alexx's interests by helping to coach her in softball, attending her dance recitals, and asking about her horse shows. However, Wendy also testified that she is currently struggling in her relationship with Alexx. Specifically, she indicated that Alexx is "so scared of making anybody mad, and she is so scared to voice her opinion and be herself" that she and Alexx do not "have much of a relationship at all."

Throughout her testimony, Wendy appeared to blame Ray for the problems with her relationship with Alexx. She testified that Ray hinders their relationship and fails to keep her informed about Alexx's daily life. Wendy cited to numerous problems in her visitation time with Alexx. She indicated that Ray is not flexible in permitting her to have additional time with Alexx, even when such time is important to Alexx. Wendy testified that when she does come to Nebraska to visit with Alexx or attend one of Alexx's activities, she is not permitted to spend much, if any, alone time with Alexx and is constantly accompanied by Ray's wife and is restricted on how long she can see Alexx. In addition, Wendy testified that Ray dictates when Wendy and her family can go on vacation if they want Alexx to come. And, Wendy testified that Ray told her that if she wanted Alexx at her wedding, she needed to plan the wedding for her scheduled visitation time.

In contrast, Wendy testified that she always tries to be flexible with Ray when he asks to reschedule her visitation time or when he is trying to schedule a family vacation. Wendy testified that she has done nothing wrong in terms of her relationship with Alexx. She testified that Ray's decision to record and physically monitor her telephone calls with Alexx has put pressure on Alexx and on her relationship with Alexx because they are no longer free to discuss things with each other. She testified that Alexx has had dry and itchy skin since she was just a baby and that Alexx's itching is not related to her relationship with Wendy.

Wendy asked that she be awarded full custody of Alexx. Wendy indicated to the court that Alexx had expressed an interest in moving to Kansas with Wendy. In addition, Wendy believed that Alexx's moving to Kansas would improve their relationship. In the alternative, Wendy asked that she be given legal custody of Alexx and extended summer visitation time with her.

## 4. OTHER EVIDENCE

In addition to their own testimony, both Ray and Wendy offered additional evidence concerning their current circumstances and their parenting abilities. Over Wendy's objection, Ray offered the testimony of Alexx's therapist, Sharer-Mohatt.

Sharer-Mohatt testified that she was a clinical psychologist who had been practicing for more than 15 years. Much of her practice had been dedicated to treating children and adolescents. Sharer-Mohatt testified that Alexx had been one of her patients since November 2009. She indicated that she had met with Alexx weekly since that time and that, as a result, she had seen Alexx approximately 75 times. Prior to beginning any therapy with Alexx, Sharer-Mohatt met with Ray and his wife to discuss their concerns about Alexx. They told Sharer-Mohatt that they were concerned that Alexx appeared to be anxious, sad, and withdrawn. They also relayed to Sharer-Mohatt that there were some custody issues between Ray and Wendy which had involved Alexx.

After talking with Ray and his wife and meeting with Alexx, Sharer-Mohatt believed that Alexx was suffering from anxiety. Such anxiety was precipitated by Alexx struggling with transitions between her parents' homes and by her feeling pressured by Wendy to move to Wendy's home. Sharer-Mohatt was particularly concerned about Alexx's outward demonstrations of anxiety, which she believed indicated that Alexx was suffering from a very high level of stress. These outward demonstrations of anxiety included being fidgety and reserved during therapeutic sessions, suffering from prolonged sadness, and scratching herself excessively. Sharer-Mohatt testified that Alexx's symptoms improved when Alexx's contact with Wendy was restricted in March and April 2011. Specifically, Sharer-Mohatt observed Alexx to be more talkative and generally happier. During this time period, Alexx did not report that she felt any stress and there were fewer scratches on her arms.

Sharer-Mohatt testified that after her sessions with Alexx and after listening to recorded telephone calls between Alexx and Wendy, she had concerns about Wendy's interactions with Alexx. Generally, Sharer-Mohatt expressed a concern about the way that Wendy communicated with Alexx and about how Wendy dealt with her emotions when discussing things with Alexx. Wendy appeared to try to make Alexx feel guilty about making certain choices. For example, Sharer-Mohatt described a situation where Wendy became very upset with Alexx when she expressed a desire to participate in a horse show rather than go on a vacation with Wendy and her family. While Wendy was understandably disappointed and upset by Alexx's decision, Sharer-Mohatt believed that Wendy acted inappropriately in communicating her feelings to Alexx, who was only 9 or 10 years old at the time. Sharer-Mohatt testified concerning Wendy's behavior, "It's not the child's place to contain the anger and disappointment of the parent. It's the parent's place to contain that themselves and then be able to speak with the child about it."

Sharer-Mohatt also expressed a concern with Wendy's tendency to place Alexx in situations where she was forced to choose between Wendy and Ray. She testified that forcing Alexx to choose between her parents and her parents' activities is not age appropriate and is damaging to Alexx's emotional development. In addition, Sharer-Mohatt indicated that Wendy actively encouraged Alexx to stop seeing Sharer-Mohatt, which harmed the patient-therapist relationship.

Sharer-Mohatt testified that it is important that Alexx have a positive relationship with Wendy. She recommended that in order to improve this relationship and prevent further emotional damage to Alexx, Wendy should participate in individual mental health counseling so that she could learn how her behavior has negatively impacted Alexx and has increased Alexx's level of stress and anxiety. She further recommended that until Wendy has completed such counseling, Wendy and Alexx's visitation sessions should be supervised by a mental health professional.

Wendy offered the testimony of various family and friends, including her husband, the pastor at her church, her mother-in-law, and her sister. These witnesses all testified that Wendy is a caring, involved mother who loves each of her children very much. The witnesses also offered testimony which indicated that Ray has not been completely supportive of Wendy and Alexx's relationship.

5. DISTRICT COURT ORDERS

After the parties completed their presentations of evidence, Ray made a motion for a directed verdict as to the issue of Wendy's request for a change in custody. The district court sustained Ray's motion, finding that "there's insufficient evidence for a change in custody as requested by [Wendy]." Subsequently, the court entered a temporary order concerning Ray's request for modification of Wendy's visitation with Alexx.

In the temporary order, the district court found that a material change in circumstances had occurred since the March 2006 custody order such that "[Alexx] has experienced significant anxiety as a result of [Wendy] putting pressure on Alexx to make choices, which are inappropriate for a child of her age, relating to which parent she should spend time with." The court recognized that both Ray and Wendy love Alexx very much; however, the court summarized the evidence presented in the case as follows:

> The central problem in this case is Wendy's completely inappropriate pressuring of Alexx and her apparent inability to "get it" that Alexx should not be subjected to the kind of severe pressure Wendy has brought to bear. It is evident that Wendy is very frustrated with Alexx's interest in horse shows, which is an activity Alexx apparently became interested in through Ray's wife. Wendy has also pressured Alexx about other matters including making choices regarding church attendance and communion, Ray being Catholic and Wendy being Lutheran.

As a result of the court's findings, it ordered Wendy to participate in counseling to learn how her behavior has increased Alexx's stress and anxiety, to learn about Alexx's developmental states and emotional development, and to develop skills to avoid placing Alexx in situations where she is forced to choose between her parents. The court permitted Wendy to have unsupervised visitation with Alexx while she completed her counseling. The court indicated it would enter a final order concerning Wendy's visitation with Alexx after Wendy had completed the counseling requirement.

Less than 1 month after the district court filed its temporary order, Alexx's attorney filed a motion to suspend Wendy's visitation with Alexx and a motion requesting that Alexx be permitted to speak with the trial judge in chambers. The court permitted Alexx to testify. During her testimony, Alexx told the court that during her previous weekend visitation with Wendy,

Wendy became very angry with Alexx and accused her of lying about things that had happened at Wendy's home. Wendy indicated that these lies came up during the modification trial. Alexx was very upset after her visit. She told the court that she feels a great deal of stress when she is with Wendy and that she got a severe headache and started to itch after the last visit. She told the court that she did not want to attend visitation with Wendy for the next month. Alexx testified that although she loves Wendy, she does not trust her.

The district court found Alexx to be a credible witness and temporarily suspended Wendy's visitation time.

Subsequently, Wendy submitted evidence to the district court demonstrating that she had participated in counseling. After the court received this evidence, it entered a final order concerning Ray's request for modification of Wendy's visitation with Alexx. In the order, the district court noted that Wendy's visitation with Alexx had been suspended for approximately 3 months. The court went on to find:

> Wendy has engaged in counseling as provided in the Court's order . . . and . . . Alexx is still in therapy. It is in Alexx's best interest that there be parenting time in the presence of Alexx's counselor . . . and Wendy and her counselor, . . . giving the therapists an opportunity to offer guidance and suggestions. Thereafter, for a period of two months, Wendy should have parenting time once a month to allow Alexx to transition back into normal parenting time.

The court specifically indicated that Wendy and Alexx should participate in two therapeutic visitation sessions sometime during the 45 days after the order had been entered. The court stated, "These sessions of parenting time are not optional." The court then indicated that after the two therapeutic sessions had been completed, Wendy and Alexx should have one weekend of visitation per month for the next 2 months. The court also indicated that Wendy could have regular telephone visitation time with Alexx as provided for in the March 2006 order.

After the therapeutic visitations and the two monthly, unsupervised visitations, Wendy's parenting time returned to the time she had previously received pursuant to the March 2006 order except that her summer visitation time was reduced from 6 continuous weeks to 4 continuous weeks.

The court also ordered Wendy to pay $15,000 toward Ray's attorney fees.

Wendy appeals from the district court's order here.

## III. ASSIGNMENTS OF ERROR

On appeal, Wendy alleges that the district court erred in (1) denying her motion for a custody evaluation; (2) permitting Alexx's therapist to provide expert testimony; (3) denying her motion to change custody; (4) altering the prior visitation schedule, such that she must participate in temporary supervised visitation with Alex and such that her summer visitation time is decreased by 2 weeks; and (5) awarding Ray attorney fees.

## IV. ANALYSIS

### 1. STANDARD OF REVIEW

Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002).

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002).

### 2. MOTION FOR INDEPENDENT PSYCHOLOGICAL EVALUATION

At the outset of the modification proceedings, Wendy filed a motion requesting that the district court appoint a mental health professional to conduct a custody evaluation. In her motion, Wendy alleged that such an evaluation would "greatly aid the court in making a determination as to who should have custody of the minor child of the parties." After a hearing on the matter, the court asked Alexx's court-appointed attorney to provide her opinion concerning whether such an evaluation was necessary. Counsel indicated to the court her opinion that "I [don't] really feel it [is] probably necessary given the cost . . . ." However, counsel also told the court that she was "not going to object either way."

Ultimately, the district court denied Wendy's motion for a custody evaluation. The court stated that during the initial paternity proceedings, it had made a finding that both Ray and Wendy were fit, proper, and good parents. The court went on to state that although custody evaluations can be useful, given its previous findings about the parties' parenting abilities and given the costs associated with such an evaluation, it would not order the evaluation. Wendy appeals from the court's decision.

On appeal, Wendy alleges that the district court erred in denying her motion for a custody evaluation because "[t]he court requires an objective and unbiased expert opinion in order to determine the best interests of the child . . . ." Brief for appellant at 26. She further alleged that the only expert opinion the court heard was that of Sharer-Mohatt, who was clearly biased in favor of Ray because he hired her and because he provided her with background information about Alexx's behavior and feelings. We conclude that Wendy's assertion lacks merit.

Before we address the district court's decision not to order a custody evaluation in this case, we must first address the basic contention contained in Wendy's brief that a trial court must receive expert testimony about a child's best interests in order to make a decision about custody. Such a contention is simply not true. In fact, this court has previously stated in another custody modification case, *Boamah-Wiafe v. Rashleigh*, 9 Neb. App. 503, 510, 614 N.W.2d 778, 784 (2000), that "we do not agree with the trial court's statements that a witness testifying as to children's best interests must be a psychologist, psychiatrist, or someone with a Ph.D or master's degree in child development." A custody evaluation performed by a licensed mental health

professional is not required in every custody case. Lay witnesses, including, and especially, the parents of the child or children at issue, may testify concerning their opinions about custody and about best interests.

In this case, both Ray and Wendy provided detailed and extensive testimony concerning their opinions about the custody and best interests of Alexx. In addition, each parent provided the testimony of other witnesses to aid the court in determining what would be in Alexx's best interests. Included in such evidence was the testimony of Alexx's therapist, Sharer-Mohatt.

Sharer-Mohatt, who had counseled Alexx for almost 3 years, testified concerning her observations about Alexx and about her opinions as to Alexx's best interests. Wendy argues that Sharer-Mohatt's testimony was biased in favor of Ray, which makes it even more important to have an independent evaluation done on Alexx. However, there is no evidence in the record to support Wendy's contention that Sharer-Mohatt was biased. Ray did provide Sharer-Mohatt background information prior to Alexx's first appointment; however, there was evidence that such information was limited to Ray's observations about Alexx's recent behavior and about there being a "custody issue" with Wendy. Moreover, a reading of Sharer-Mohatt's testimony reveals that she based her opinions solely on her extensive discussions with Alexx and on her own observations of Alexx's behavior and struggles. In addition, Sharer-Mohatt testified that she made herself available to Wendy so that Wendy could be involved in Alexx's therapy and provide her own background information.

Based on our review of the record, we cannot say that the district court erred in denying Wendy's request for a custody evaluation. There was ample evidence presented for the court to make a determination regarding Alexx's best interests. Such evidence included the testimony of Alexx's long-time counselor, who, contrary to Wendy's assertions, was seemingly unbiased and only concerned about Alexx and her emotional development. Moreover, given the evidence presented, we do not think there would have been much gained from forcing Alexx to visit another counselor or mental health professional due to her parents' fight over her custody. We affirm the decision of the district court to deny Wendy's request for a custody evaluation.

### 3. EXPERT TESTIMONY OF CHILD'S THERAPIST

Prior to trial, Wendy filed a motion to exclude the testimony of Sharer-Mohatt in its entirety. Her motion was based on the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). The district court overruled the motion, stating, "I'm going to overrule the motion to exclude . . . . However, certainly . . . there is a right to object on foundation and on many other appropriate objections at the time of trial. I won't enter an order excluding the testimony of [Sharer-Mohatt] at this point . . . ."

Sharer-Mohatt testified at trial. During her testimony, she discussed the "splitting process." She defined this theory as

> a psychological defense that we all employ in the process of our normal coping and protecting ourselves. It's a process by where we all, as human beings, have our good and our bad parts, our good and not so good parts. But when an individual has difficulty accepting their own not-so-good or bad parts, they tend to disavow them and split them out and locate them somewhere else, normally, in another person.

- 9 -

A parent who uses this coping mechanism to deal with the strain of an on-going custody battle by believing the other parent to be "all bad" can impose these feelings on his or her child. Sharer-Mohatt testified:

> Because the child is placed in the position of trying to decide, okay, I, for example, I love my mom and I love my dad. But if mom says dad is all bad or dad is, you know, dad causes problems, but the child's experience isn't that, then it creates conflict and anxiety within the child, and under some circumstances, children begin to feel, then, that they have to make a choice between parents.

Ray's counsel asked Sharer-Mohatt if this type of pressure was being placed on Alexx. Before Sharer-Mohatt answered the question, Wendy's counsel objected and requested an opportunity to voir dire Sharer-Mohatt. During this voir dire, Sharer-Mohatt testified that the theory of the splitting process had been tested on clinical populations and had been subjected to peer review. In addition, she testified that the methodology for the theory was observation. However, Sharer-Mohatt also indicated that she could not provide specific publications or dates where the theory was discussed nor could she report the rate of error for the theory.

Based on the voir dire, Wendy objected to any further testimony about the splitting process because Sharer-Mohatt was not an expert in this field. The court overruled the objection and allowed Sharer-Mohatt to testify that Wendy was putting pressure on Alexx to view Ray as "all bad."

Sharer-Mohatt also testified that she believed that Alexx's scratching was a physical symptom of the amount of stress and anxiety Alexx was currently experiencing. Wendy objected to this testimony on the basis of improper foundation. The court overruled her objection.

On appeal, Wendy asserts that the district court erred in permitting Sharer-Mohatt to testify about the splitting process and about the cause of Alexx's scratching. Specifically, Wendy argues in her brief that Sharer-Mohatt was not qualified to testify as an expert concerning the splitting process and that she is not a medical doctor who can diagnose or determine the cause of Alexx's skin condition. We find Wendy's assertions to be without merit.

### (a) Splitting Process

An expert's opinion is ordinarily admissible under Neb. Rev. Stat. § 27-702 (Reissue 2008), if the witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact, (3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination. *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004). The Nebraska Supreme Court held in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), that when the opinion involves scientific or specialized knowledge, Nebraska courts should apply the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Under our recent *Daubert/Schafersman* jurisdiction, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004). This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology can be applied to the facts at issue. *Id*. In addition, the trial court must determine if the witness has applied the methodology in a reliable manner. *Id*.

In evaluating expert opinion testimony under *Daubert*, where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Schafersman v. Agland Coop, supra*. In determining the admissibility of an expert's testimony, a trial judge may consider several more specific factors that *Daubert* said might "bear on" a judge's gatekeeping determination. *Schafersman v. Agland Coop, supra*. These factors include whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id*. These factors are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. *Id*.

Wendy contends that Sharer-Mohatt's testimony failed to establish that the splitting process theory has any validity or reliability and that, as a result, she should not have been permitted to testify about the splitting process as it relates to Wendy and Alexx's relationship.

Prior to providing any testimony about her therapy with Alexx or about her clinical impressions, Sharer-Mohatt testified about her extensive background in psychology. She testified that she was a clinical psychologist who had been practicing for more than 15 years. Much of her practice had been dedicated to treating children and adolescents, including working with schools and with the juvenile court system. She indicated that she had treated well over 100 children. In addition, in her curriculum vitae, submitted as an exhibit to the court, she detailed the many papers she had published during the course of her career and the many conferences and professional associations she had been a part of during that same time.

After explaining the splitting process and the possible implications in these custody proceedings, Sharer-Mohatt testified that the theory of the splitting process had been tested on clinical populations and had been subjected to peer review. In addition, she testified that the methodology for the theory was observation. And, even though Sharer-Mohatt also indicated that she could not provide specific publications or dates where the theory was discussed nor could she report the rate of error for the theory, the court found that her testimony regarding the theory was admissible.

Generally, a trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. See *City of Lincoln v. Realty Trust Group*, 270 Neb. 587, 705 N.W.2d 432 (2005). We cannot say that the court abused its discretion in permitting Sharer-Mohatt's testimony about the splitting process. Sharer-Mohatt is clearly a qualified child psychologist. And, though she was not extremely detailed in providing the basis behind the splitting process theory, she did affirmatively state that the theory had been tested and peer reviewed. In addition, she provided some basis for believing that the theory is generally accepted in the psychological community.

Moreover, Sharer-Mohatt testified that Alexx had been one of her patients since November 2009, or almost 3 years by the time of the modification trial. Clearly, then, Sharer-Mohatt had spent a great deal of time talking with Alexx and observing her behaviors and emotional state. The court did not abuse its discretion in permitting Sharer-Mohatt to testify

regarding the splitting process or in how such process had affected Alexx's emotional well-being. Wendy's assertions to the contrary are without merit.

### (b) Skin Condition

Wendy also asserts that the district court erred in permitting Sharer-Mohatt to testify that Alexx's scratching was the result of her aniexty and stress. Wendy argues that only a physician would be able to provide such a diagnosis.

Wendy's assertion is without merit. As we detailed above, Sharer-Mohatt is an experienced child psychologist who is qualified to offer an opinion about the physical effects of Alexx's extreme stress and anxiety. The fact that Sharer-Mohatt is not a medical doctor and that there are other possible causes for Alexx's skin condition should go to the weight of Sharer-Mohatt's testimony and not to its admissibility.

### 4. MOTION TO CHANGE CUSTODY

At the close of the modification trial, Ray made an oral motion for a directed verdict as to Wendy's request for a change in custody. The district court granted Ray's request for a directed verdict on the custody issue. The court stated: "I think there is -- even giving every reasonable inference to the nonmoving party [--] that there's insufficient evidence for a change in custody as requested by [Wendy]."

On appeal, Wendy asserts that the district court erred in denying her motion for a change in custody. Wendy's argument in support of this contention is essentially based on her renewed assertion that the court erred in permitting the testimony of Sharer-Mohatt and in failing to appoint an independent psychologist to conduct a custody evaluation.

In our analysis above, we concluded that the district court did not err in permitting Sharer-Mohatt's testimony or in failing to appoint an independent mental health professional to conduct a custody evaluation. Accordingly, we also conclude that to the extent Wendy challenges the district court's decision to deny her motion for a change in custody because of its decisions regarding Sharer-Mohatt's testimony and regarding the custody evaluation, her assertion has no merit.

Moreover, we also conclude that the district court did not abuse its discretion in finding that Wendy failed to demonstrate that a change in custody was warranted. Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). In her complaint to modify custody, Wendy generally alleged that a change in custody was warranted because Ray had actively interfered in her relationship with Alexx.

However, at the modification trial, Wendy did not provide any evidence to prove that Ray was an unfit parent or that a change in custody was in Alexx's best interests. Wendy testified that her relationship with Ray was strained and that they communicated only through e-mail. In addition, she testified that Ray was often unwilling to be flexible with her visitation time or to give her any additional time not required by the court's order. However, she did not provide any evidence to prove how her strained relationship with Ray affected Alexx or how such behavior

made him an unfit parent. Instead, Wendy testified that while Alexx was in Ray's custody, she was a good student who excelled in athletics.

Wendy also testified concerning Ray's monitoring and recording of her telephone calls with Alexx. She testified that she did not give him permission to listen in on her conversations with Alexx and that he had done so without her knowledge. Again, though, there was no evidence about how this behavior negatively affected Alexx. Instead, the evidence suggested that Ray was monitoring Alexx's conversations with Wendy in order to make Alexx feel more comfortable and that, in fact, Alexx appreciated Ray's involvement in these conversations.

Wendy simply failed to provide sufficient evidence to demonstrate that a material change of circumstances had occurred which would warrant a change in custody. Accordingly, upon our review of the evidence presented, we cannot say that the district court erred in denying her motion for a change in custody.

### 5. ALTERATION OF VISITATION SCHEDULE

Wendy asserts that the district court erred in modifying her visitation with Alexx by (1) ordering her to participate in two visitation sessions supervised by her therapist and by Alexx's therapist and (2) permanently altering her summer visitation time such that it decreased from 6 continuous weeks to 4 continuous weeks. We will separately address each of Wendy's assertions regarding the modifications to her visitation. However, first, we recount the pertinent principles of law relating to modification of a noncustodial parent's visitation time.

Visitation relates to continuing and fostering the normal parental relationship of the noncustodial parent. See *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001); *Walters v. Walters*, 12 Neb. App. 340, 673 N.W.2d 585 (2004). The best interests of the child are the primary and paramount considerations in determining and modifying visitation rights. *Id*. The best interests inquiry has its foundation in both statutory and case law.

Neb. Rev. Stat. § 43-2923(6) (Cum. Supp. 2012) provides that in determining custody and parenting arrangements:

> [T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . .
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; [and]
>
> (c) The general health, welfare, and social behavior of the minor child.

In addition to these factors, the Nebraska Supreme Court has previously held that in determining a child's best interests, courts

> "'may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental

- 13 -

capacity to provide physical care and satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension regardless of chronological age, and when such child's preference for custody is based on sound reasons; and the general health, welfare, and social behavior of the child.'"

*Davidson v. Davidson*, 254 Neb. 357, 368, 576 N.W.2d 779, 785 (1998).

With these principles in mind, we turn to a discussion of Wendy's specific assertions.

### (a) Temporary Supervised Visitation

Wendy asserts that the district court erred in ordering her to participate in two visitation sessions supervised by her therapist and by Alexx's therapist. Specifically, Wendy asserts that any restriction on a parent's visitation is an extreme measure that is simply not merited by the facts of this case. Upon our review of the record, we find that Wendy's assertion has no merit.

The trial court has discretion to set a reasonable visitation schedule. See *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). The determination of reasonableness is to be made on a case-by-case basis. *Id.* The Nebraska Supreme Court has previously stated that limits on visitation are an extreme measure. *Fine v. Fine, supra.* However, the court has also stated that such limits may be warranted where they are in the best interests of the children. *Id.*

In its final order, the district court ordered Wendy and Alexx to participate in two sessions of supervised visitation with their therapists present. The court indicated its belief that such visitation sessions would help to repair Wendy and Alexx's relationship and would help Wendy learn to communicate better with Alexx. After these therapeutic sessions occurred, Wendy's regular visitation with Alexx was gradually restored.

Upon our de novo review of the record and given the facts of this specific case, we cannot say that the district court abused its discretion in requiring Wendy to participate in two therapeutic visitation sessions. Although this requirement does amount to a restriction on Wendy's visitation, it is a fairly limited and brief restriction. And, our reading of the evidence presented by the parties reveals that, at a minimum, Alexx has experienced extreme stress as a result of her relationship with Wendy. Whether that stress is caused by Wendy, as Ray suggests, or whether that stress is simply caused by Alexx's being shuffled back and forth between her parents, as Wendy suggests, Alexx is clearly suffering. There was evidence that Alexx feels more comfortable interacting with Wendy when someone else is present. These therapeutic sessions are clearly meant to assist Alexx in regaining trust in Wendy and in repairing their relationship.

Based on our reading of the record, we affirm the order of the district court concerning the therapeutic visitation sessions.

### (b) Summer Visitation

Wendy asserts that the district court erred in reducing her summer visitation time with Alexx from 6 continuous weeks to 4 continuous weeks. In her brief on appeal, Wendy does not provide much argument in support of her assertion. In fact, she really only argues that the court erred in reducing her summer visitation time because it did not provide a rationale for its decision.

We first note that Wendy does not point us to any authority to suggest that the district court must detail its rationale for making specific modifications to a visitation schedule. And, while we agree with Wendy's assertion that the district court did not provide any explanation for its specific decision to decrease her summer visitation time, we do not agree that the reasons for the court's decision are unclear when we read the court's order as a whole. Given the evidence presented at the modification trial and the subsequent hearings, and given the court's specific findings about Wendy and Alexx's current relationship, the reasons for the court's decision regarding the summer visitation time are clear.

The court found that Wendy had acted inappropriately in her relationship with Alexx by placing Alexx in a position which forced her to make age-inappropriate decisions, including pressuring Alexx to come live with Wendy in Kansas. The court also found that Wendy's behavior had negatively affected Alexx's physical and emotional well-being. The court found that Alexx was a credible witness when she testified that she was feeling stress about her relationship with Wendy and felt that she needed a break in their visitation time.

Given these findings, we can assume that the court decreased Wendy's summer visitation time with Alexx's best interests in mind. The court clearly believed that it would be in Alexx's best interests to spend more time with Ray during her summer visitation because of the current strain existing in Wendy and Alexx's relationship as a result of Wendy's inappropriate behavior. We cannot say that the district court abused its discretion in this regard.

### 6. ATTORNEY FEES

At the modification trial, Ray's attorney submitted an affidavit concerning the time he had expended in preparing for the proceedings. That affidavit indicated that Ray's attorney fees totaled approximately $22,000 for his attorney's work on the case. At the final hearing, held 6 months after the modification trial, Ray's attorney submitted an updated affidavit concerning the time he had expended in preparing for the trial and the subsequent hearings. That affidavit indicated that Ray's attorney fees totaled approximately $30,600. Ray asked that he be awarded $30,000 in attorney fees. Wendy argued that she should not have to pay any of Ray's fees because the amount of fees incurred was unreasonable and because Ray initiated the case by filing his complaint to modify visitation.

In the district court's order, it awarded Ray $15,000 in attorney fees. The court ordered Wendy to pay $500 per month toward the attorney fees until they were paid in full. Wendy appeals from the court's award of attorney fees to Ray. Specifically, she argues that the award is excessive and that Ray was not the "'prevailing' party" and is not entitled to attorney fees. Brief for appellant at 31.

In a paternity action, attorney fees are reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Drew on behalf of Reed v. Reed*, 16 Neb. App. 905, 755 N.W.2d 420 (2008). Absent such an abuse, the award will be affirmed. *Id.*

A trial court's award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. See *id.*

Ray's attorney submitted an affidavit to the trial court which detailed the work he completed on the case and the number of hours he spent completing that work. As his counsel noted at the final hearing, the case spanned a period of 25 months, during which time there were numerous hearings concerning Wendy's temporary visitation schedule and various discovery motions. In addition, the proceedings did not end after the trial was held. Instead, the litigation continued and Wendy's visitation with Alexx continued to be altered and reviewed while she completed her counseling as ordered by the court. And, contrary to Wendy's assertions on appeal, Ray was the "prevailing party," because Wendy was ordered to attend counseling and to participate in supervised visitation with Alexx for a period of time, as Ray requested. Moreover, Wendy did not submit any evidence to demonstrate that she was not able to pay any portion of Ray's attorney fees. In fact, neither party submitted any evidence to demonstrate his or her current financial circumstances.

Given the nature and extent of the proceedings and the general equities of the case, we cannot say that the court abused its discretion in awarding Ray $15,000 in attorney fees. Based on Ray's evidence, the amount was fair and reasonable and constituted only half of Ray's total accumulated attorney fees and half of the requested amount. Accordingly, we affirm the award of attorney fees.

## V. CONCLUSION

We find that the district court did not err in denying Wendy's request for an independent custody evaluation or in permitting Sharer-Mohatt to testify regarding her opinions about Alexx's best interests. In addition, we conclude that the district court did not abuse its discretion in denying Wendy's request to change custody or in granting Ray's request for a modification in the visitation schedule. Finally, we conclude that the court did not err in awarding Ray a portion of his attorney fees.

AFFIRMED.